Filed 1/4/22  In re A.F. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.F., a Person Coming Under the Juvenile Court Law. | B309579 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP01125A) |
| Plaintiff and Respondent, | |
| v. | |
| C.F., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steff R. Padilla, Juvenile Court Referee. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Father C.F. appeals the dispositional order removing his then one-year-old daughter, A.F. from his custody, arguing it was not supported by substantial evidence, and that there were reasonable means to protect her other than removal, including unannounced home visits. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

This family came to the attention of the Los Angeles County Department of Children and Family Services (Department) in January 2020, after the Department received a referral that mother I.T. was incarcerated, and that maternal family members were caring for A.F., but were interfering with father's visitation, and were not properly caring for A.F. According to the reporting party, A.F. was sick, dirty, and had a diaper rash, and there were concerns about domestic violence in maternal grandparents' home, and allegations that maternal uncle had molested mother.

The Department social worker visited maternal grandparents' home and found it to be clean and organized. Maternal grandmother denied any domestic violence or sexual abuse by maternal uncle. Maternal grandparents were seeking a legal guardianship over A.F. during mother's incarceration for robbery. A.F. was clean and did not have any marks, bruises, or rashes. There was a pending custody and paternity case between mother and father. Father was allowed three days of unmonitored visitation per week.

According to maternal grandmother, father was impatient and antisocial, and he had no parenting experience or education. Maternal grandfather reported that when mother and father argued, he saw father "roll up his sleeves" and act aggressively. Father would also give maternal grandparents' "intimidating"

looks during custody exchanges, and he refused to discuss anything about A.F.'s care with them.

Mother reported there was domestic violence in her relationship with father. She obtained a restraining order against him which protected mother, A.F., and maternal grandparents. The restraining order was subsequently modified so that father could have visitation with A.F. Mother had ended her relationship with father in November 2019. Father was controlling, and abused her physically and emotionally, even strangling her while she was pregnant with A.F. Father had anger issues and "shook [infant A.F.] in anger due to child not responding to father holding her based on his expectations." Father also took A.F. from maternal grandparents and did not return her for a month in violation of the court's visitation order.

Mother denied any sexual abuse history, or any domestic violence between maternal grandparents. According to mother, father was always in a bad mood and abused his prescription pain medication. Mother wanted her parents to obtain custody of A.F. because she did not think A.F. would be safe with father. Mother cried when discussing father's domestic violence.

On January 22, 2020, father had a visit with A.F., and went to the police station to report that her "p---- was red" and that he was concerned because maternal uncle had access to the child and had molested mother. Police immediately examined A.F. and observed no redness or marks or bruises.

A Department social worker visited father's home on January 24, 2020. Father shared an apartment with paternal grandparents and paternal uncle. He refused to be interviewed alone. Father is a Regional Center client. He received 15 hours per month assistance. He admitted to domestic violence in his

relationship with mother, but claimed mother was the aggressor and that he never struck her.  He denied shaking his daughter.  Father was loud and aggressive during the interview.

Father denied many aspects of his history, which had been thoroughly documented, such as prior child welfare involvement with his family when he was a child for abuse by paternal grandfather, mental health issues, including multiple psychiatric hospitalizations when he was a minor and suicidal ideation, and his violent criminal history for which he was sentenced to four years in prison.

On January 25, 2020, father took A.F. to the hospital because her "p---- was red" even though the social worker had explained that diaper rashes are common and normal.  Doctors at the hospital did not notice any redness and advised father to follow up with primary care.

Paternal grandmother told the Department she cared for A.F. "everyday" and that father is a good parent and is very affectionate and attentive.  She described maternal family members as "bad" and that mother once punched father's face.  Paternal grandfather also reported that mother would hit father.  Other paternal relatives claimed that A.F. would arrive for visits dirty and unbathed.

Father's Regional Center independent living skills worker had no concerns about father or his ability to care for A.F.

A.F.'s babysitter reported that A.F. was always well-cared for by maternal grandparents.  However, she would return from visits with father "more serious, clingy" and would cry more.

On February 5, 2020, father texted the social worker that A.F. had a "burn" on her private parts, a mark on her neck, and a rash on her face.  On February 8, 2020, father texted the social

worker, reporting A.F. had a bruise on her spine and a rash on her "private area," and that he was taking her to the emergency room.

The Department obtained a removal order on February 24, 2020. When the social worker informed father of the order, he became upset and said he "refuses to comply with any type of therapeutic services" even if ordered by the court. The Department also filed a petition, with allegations under Welfare and Institutions Code section 300, subdivisions (a) and (b) based on domestic violence between mother and father, and father shaking A.F. (All further statutory references are to this code.) A.F. was detained from mother and father on February 27, 2020, and placed with maternal grandparents. Father's visitation was ordered to be monitored.

Soon after A.F.'s detention, the Department filed a first amended petition adding allegations based on father's mental health history and his inability to independently parent A.F., including his lack of parenting insight, such as mistaking diaper rash for sexual abuse.

When the Department interviewed father about the new allegations, father accused the social worker of trying to "provoke" him and told her not to call him if the Department did not have anything good to say about him, and to "keep your mouth shut." When the social worker explained that the Department was there to support him and provide services to address any concerns, father told her to "[t]ake that bull---- somewhere else."

According to the July 2020 jurisdiction/disposition report, A.F. was thriving with maternal grandparents; she was well-cared for and happy and did not have any marks or bruises.

Their home was appropriate, and they were cooperative and communicative with the Department.

Father still refused to be interviewed alone, without the assistance of paternal family members and his Regional Center caseworker, who often responded for father. Paternal family members appeared to be in denial about father's history, and the risks to A.F. For example, paternal grandmother minimized father's violent behaviors and asserted he did not have a mental health history.

Father had difficulty retaining information about basic infant care that the Department repeatedly told him. Father frequently raised his voice at social workers, made threats, and could not understand why the Department was involved with the family, even though it was explained to him repeatedly. He was also fixated with the belief that A.F. was being sexually abused, even though there was no evidence of sexual abuse. Father was hypervigilant, constantly inspecting A.F.'s body for marks and bruises. He made vulgar comments about A.F.'s "p----" and her smelling like "shit," accusing maternal grandparents of not washing "her ass in weeks." He also would not agree to have his visitation monitored, so he was unable to visit A.F. for a period. His visitation resumed after his Regional Center worker was approved as a visitation monitor.

The MAT assessor noted that father appeared "angry" and "defensive" and was focused on his own needs rather than the needs of his daughter. The assessor believed "it would be incredibly challenging for him to participate in services needed for his child to thrive."

On July 9, 2020, the juvenile court sustained allegations in the first amended petition, based on the history of domestic

violence between mother and father, and father's limited ability to independently care for A.F. Father does not challenge these findings on appeal.

According to the Department's August 2020 supplemental report, father had enrolled in parenting classes, individual counseling, domestic violence classes, and anger management classes.

During a July 2020 visit to father's home, father and the paternal grandparents videotaped the social worker without her consent, and refused to stop when she asked them to. The social worker felt unsafe and left. The Department suspended in person visits with father due to safety concerns because of his hostile behavior.

A December 2020 last minute information for the court reported that father refused to discuss his progress in his programs with the Department. His Regional Center worker reported that father had completed an eight-hour parenting course, an eight-hour domestic violence course, and an eight-hour anger management course. He was seeing a psychiatrist monthly, but was not prescribed any medications, and was not diagnosed with any mental health disorders. She also reported that visits were going well, and that father was independently caring for A.F. without his mother's help. However, father refused to allow the Department to observe his visits with A.F.

At the December 8, 2020 disposition hearing, A.F.'s counsel and father asked for A.F. to be placed with father. The court removed A.F. from father and ordered father to participate in reunification services. The court acknowledged that "contempt" for the Department alone was an insufficient basis to remove a child from a parent. But the court found that if father could not

cooperate with the Department, it was impossible for the court to assess A.F.'s safety in his care, and impossible to deliver services to ensure her safety. This timely appeal followed.

**DISCUSSION**

Section 361, subdivision (d) provides that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . *with whom the child did not reside at the time the petition was initiated*, unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." (Italics added; see *In re S.S.* (2020) 55 Cal.App.5th 355, 373.)

A removal order is proper if it is based on proof that the child will be at substantial risk of harm if he or she remains in the parent's custody. "The parent need not be dangerous and the child need not have been actually harmed before removal is appropriate." (*In re R.V.* (2012) 208 Cal.App.4th 837, 849.) The focus is on averting harm to the child. We review the dispositional order for substantial evidence, keeping in mind the trial court had to find clear and convincing evidence supporting removal. (*In re V.L.* (2020) 54 Cal.App.5th 147, 155.) We must decide " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*Ibid.*)

We find such evidence here. Father does not challenge the jurisdictional findings, and the sustained findings are prima facie

8

evidence A.F. was unsafe with father.  (See *In re T.V.* (2013) 217 Cal.App.4th 126, 135 ["The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home."].) Father was angry, hostile, and denied that he ever perpetrated domestic violence against mother, suffered from any mental health problems, or had a violent criminal history.  He persisted in making unfounded allegations that A.F. was sexually abused, thereby subjecting her to invasive examinations.  His hostility toward the Department, his unwillingness to discuss his services, and his refusal to allow the Department to assess his visitation, provide additional substantial evidence to support the removal order.

## DISPOSITION

The removal order is affirmed.


GRIMES, Acting P. J.

WE CONCUR:



STRATTON, J.



WILEY, J.

9